IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Brandon Michael Wroblesky,<br><br>Plaintiff,<br><br>vs.<br><br>Commissioner of Social Security,<br><br>Defendant. | CASE NO. 1:23-cv-232-JEG<br><br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Plaintiff Brandon Michael Wroblesky filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying supplemental security income and disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties' consented to my jurisdiction in this case. Doc. 12. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In June 2018, Wroblesky filed applications for supplemental security income and disability insurance benefits alleging a disability onset date of August 1, 1996.[1] Tr. 212–19. The Commissioner denied Wroblesky's applications initially and on reconsideration. Tr. 141, 151. In October 2019,

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." McClanahan v. Comm'r of Soc. Sec., 193 F. App'x 422, 425 (6th Cir. 2006).

Administrative Law Judge (ALJ) William Leland held a hearing at which Wroblesky and vocational expert Deborah Lee testified. Tr. 33–66. In December 2019, the ALJ issued a written decision finding that Wroblesky was not disabled. Tr. 12–32.

Wroblesky appealed the Commissioner's decision and, in November 2021, this Court remanded Wroblesky's application on the stipulation of the parties. Tr. 1819, 1927. The Court directed the Commissioner to instruct the ALJ "to further consider" Wroblesky's claim, "offer [Wroblesky] a new hearing, take any further action necessary to complete the administrative record, and issue a new decision." Tr. 1819.

In May 2022, the Appeals Council vacated the ALJ's 2019 decision and remanded the case for the resolution of the ALJ's inadequate evaluation of the medical opinion evidence offered by consultative psychologist Julie Janco-Gidley, Ph.D. Tr. 1822. The Appeals Council found that the ALJ's 2019 residual functional capacity (RFC)[2] determination did not "incorporate all of Dr. Janco-Gidley's restrictions concerning the claimant's ability to understand and follow instructions, or maintain concentration, persistence or pace to complete tasks, nor does the decision explain why such limitations were not warranted." Tr. 1823.

---

[2]     An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

ALJ Leland held a remand hearing in November 2022. Tr. 1765–91. Wroblesky and vocational expert Allison Reno testified. *Id*. In December 2022, the ALJ issued a written decision finding that Wroblesky was not disabled. Tr. 1738–59. The ALJ's second decision became the Commissioner's final administrative decision once the Appeals Counsel declined to assume jurisdiction after the ALJ issued his decision. *See Bray v. Chater*, 97 F.3d 1451, 1996 WL 549773, at *1 (6th Cir. 1996) (order) (citing 20 C.F.R. § 404.984(d))[3]; Doc. 1-1 (reflecting that Wroblesky is appealing from the ALJ's decision on remand). Wroblesky filed this action in February 2023. Doc. 1. In it, he asserts that the ALJ's "RFC determination is unsupported by substantial evidence" because the ALJ "failed to properly account for the opinion of consultative psychologist Julie Janco-Gidley, Ph.D." Doc. 8, at 1.

**Factual background**

*1. Personal and vocational evidence*

Wroblesky alleges that he was born with his disabling conditions. Tr. 212. Accordingly, he alleges a disability onset date of August 1, 1996, which is his birthdate. *Id*. Wroblesky was 26 years old in 2019 when the ALJ first issued a disability determination. Tr. 26, 284. He is a high school graduate. Tr. 83. He previously worked as an employee at a McDonald's restaurant and as a stock

---

[3]      Section 404.984(a) and (d) provide that if a federal court remands a case "for further consideration and the Appeals Council remands the case to an [ALJ] … the decision of the [ALJ] …will become the final decision of the Commissioner after remand on" a claimant's "case unless the Appeals Council assumes jurisdiction of the case."

clerk at Walmart and Harbor Freight retail stores. Tr. 43–47, 1772.

2. *Medical evidence*[4]

Wroblesky regularly saw cardiologist Rula Balluz, M.D., throughout the relevant time period. *See, e.g.*, Tr. 1713–21, 2312–64, 2376–84. Dr. Balluz's treatment notes reference an appointment in June 2018, during which Wroblesky and his mother reported Wroblesky's "sustained improvement with respect to energy and activity." Tr. 2377. Wroblesky indicated that he had lost a job at Walmart that he had enjoyed which involved "stacking groceries." *Id*. He reported no difficulty performing the job but said that he'd been fired due to "reported missed days." *Id*. Wroblesky's mother indicated that she had observed "similar outcomes" throughout Wroblesky's work history. *Id*. She attributed her son's trouble keeping a job to his "difficulty remembering tasks he had to do." *Id*.

---

[4]     Wroblesky does not include objective medical evidence or medical opinion evidence in the "Relevant Medical Evidence" section of his brief. *See* Doc. 8, at 5. Wroblesky indicates that "[r]elevant evidence of Plaintiff's cognitive abilities is included in Plaintiff's argument" because the "file had become exceptionally long." *Id*. But the Court's initial order specifically instructed Wroblesky that "[a]ll facts relevant to the legal issues and discussion must be set forth in the Facts section." Doc. 4, at 3. It specified that "[a] party's arguments should be in the Argument or Analysis section of the brief, not in the Facts section." *Id*. It instructed that "[a]ny facts recited in support of the Argument or Analysis section of a brief must also be set forth in the Facts section of the brief," and that "[t]he Court will deem waived a party's reliance on any evidence not included in the party's brief(s)." Doc. 4, at 3–4. The Court's recitation of the medical evidence is thus limited to the objective and medical opinion evidence provided by the Commissioner in her brief and those other facts necessary for context.

In April 2019, Wroblesky had an appointment with Dr. Balluz. Tr. 1713–26. Dr. Balluz found that Wroblesky was "stable from [a] cardiac point of view." Tr. 1720. Wroblesky reported that for the past year, he had worked up to 30 hours per week at McDonald's "without difficulty." Tr. 2377. Dr. Balluz expressed concern for Wroblesky's ability to continue to meet the demands of his job at McDonald's and cited his physical and cognitive issues as well as his "tend[ency] to forget the orders given." *Id*. Dr. Balluz suggested that Wroblesky decrease his work hours to no more than three to four per day and find a job that demanded less of him physically and mentally. *Id*.

Wroblesky saw Dr. Balluz in April 2022. Tr. 1977–82. He reported that he could play the drums for up to two hours and drive a car without issue. Tr. 1977. He told Dr. Balluz about his new job stocking shelves at Harbor Freight three days per week from 4:00 a.m. to 8:00 a.m. Tr. 1977; *see* Tr. 1774. Wroblesky said that his days were "good" except for the one or two times per week that he had to unload a truck. Tr. 1977. Wroblesky indicated that he was able to tolerate the heavy lifting that his job sometimes required. *Id*.

### 3. *State agency and other medical opinion evidence*[5]

In October 2017, consultative examiner Rachel Galioto, Ph.D., conducted a neuropsychological evaluation. Tr. 407–14. Wroblesky's mother accompanied him to the evaluation. Tr. 409. She told Dr. Galioto that Wroblesky had lost several factory jobs for "largely unexplained reasons." *Id.* One of Wroblesky's former employers had said, however, that Wroblesky struggled to "keep[] up with his work and understand[] and remember[] what he needed to do." *Id.* Wroblesky reported "significant memory" and cognitive difficulties. *Id.* He was working at McDonald's which was "going pretty well," though he struggled due to shortness of breath to keep up with the fast pace of the job. Tr. 412.

Dr. Galioto recorded Wroblesky's medical history including hypoplastic left heart syndrome,[6] several remote strokes, epilepsy (resolved), and delayed

---

[5]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or his ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. See, e.g., 20 C.F.R. § 404.1615.

[6]    Hypoplastic left heart syndrome is a congenital birth defect in which a number of the structures on the left side of the heart—the left ventricle, mitral valves, aortic valve, or ascending portion of the aorta—do not form correctly. *Facts About Hypoplastic Left Heart Syndrome*, Centers for Disease Control and Prevention,          https://www.cdc.gov/ncbddd/heartdefects/hlhs.html [https://perma.cc/JP2R-N4HJ]. This affects the flow of blood through the heart.

development. Tr. 412. She found that Wroblesky was alert and oriented with a pleasant affect. Tr. 411. He was adequately groomed, made direct eye contact, and had a pleasant manner of relating to Dr. Galioto. *Id*. Dr. Galioto determined that Wroblesky had limited insight and described him as a "somewhat vague historian" who "relied on his mother to provide the majority of his history." *Id*.

Dr. Galioto assessed Wroblesky's intelligence and found that he had a low average full-scale IQ and high average processing speed. *Id*. His verbal comprehension, perceptual reasoning, and working memory scores indicated borderline intellectual functioning. *Id*. He had average spelling, low average reading, borderline comprehension of sentences, and extremely low math calculation. *Id*. As to Wroblesky's attention and memory, Dr. Galioto found that his processing speed was average to superior. *Id*. His attention was moderately impaired and his auditory working memory was average. *Id*. He had a mildly impaired complex working memory and sustained visual attention that was "notable for very fast, inconsistent, and inaccurate performance." *Id*. Wroblesky's learning and memory were "impaired overall" but his performance improved "with cueing" and when he was given visual information and recognition tests. Tr. 412. Wroblesky was mildly impaired in his knowledge of general information and severely impaired in category fluency. Tr. 411.

Dr. Galioto opined that Wroblesky's cognitive deficits would likely "significant[ly] implicat[e]" his ability to work. Tr. 412. She recommended that he take frequent breaks and use reminder and organizational systems. *Id*. She suggested that he receive information in both written and visual form. *Id*. Dr. Galioto opined that if Wroblesky were interested, he might benefit from working with a cognitive rehabilitation specialist. *Id*. She further stated, however, that even if Wroblesky adopted the recommended coping strategies, "given his cognitive deficits" it would not surprise her if Wroblesky "continue[d] to have difficulty maintaining competitive employment." *Id*.

In November 2018, consultative examiner Julie Janco-Gidley, Ph.D., conducted a psychological evaluation. Tr. 1632–39. Wroblesky reported physical issues and said that it was difficult for him to keep up at work due to shortness of breath. Tr. 1633. He explained that due to his congenital heart defect, he underwent multiple open-heart and other surgeries and survived "a few" strokes as a child.[7] *Id*. Wroblesky attributed his memory issues to the strokes he suffered when he was five to seven years old. *Id*. Wroblesky explained that "the left side" of his heart and "ventricle [were] plastic" so he took in less oxygen than an average person. *Id*.

Wroblesky reported mental impairments including difficulties with memory and learning. *Id*. He told Dr. Janco-Gidley that if he had to perform

---

[7]    Wroblesky's mother reported that Wroblesky had seven strokes as a child.

tasks in a certain order, he wouldn't remember some of them. *Id*. Wroblesky reported having trouble paying attention and felt hyperactive. *Id*. He described his energy level as normal. Tr. 1637.

Wroblesky discussed his performance of daily activities. Tr. 1632. He indicated that he "dress[ed], bath[ed], and groom[ed] himself." Tr. 1637. Wroblesky prepared food and cooked meals. *Id*. He shopped, cleaned, and did laundry. *Id*. Wroblesky managed his own checking account but needed to be reminded how to "properly pay" his bills. *Id*. He socialized through his church. *Id*. He enjoyed playing games and was musically talented, playing the drums, the harp, guitar, piano, and bass. *Id*.

Dr. Janco-Gidley found Wroblesky friendly and cooperative with a slightly melancholic mood. Tr. 1636. He was well-oriented. *Id*. Although Dr. Janco-Gidley noted that Wroblesky was slightly nervous, she found his affect normal. Tr. 1636. His insight and judgment were "fair to adequate." Tr. 1637. Dr. Janco-Gidley estimated that Wroblesky's cognitive functioning was in the low-average range. Tr. 1637. She found that he had the concentration and attention to perform simple calculations but struggled with serial threes. Tr. 1636. His recent and remote memory allowed him to recite three objects immediately after they were presented while he could only recite two objects after five minutes. Tr. 1637. Wroblesky was able to recall four digits forward and two digits backward. *Id*. He reported being able to follow simple

9

instructions "pretty good" if he could remember them and struggling if instructions were complex. Tr. 1638.

Concerning the four areas of cognitive functioning, Dr. Janco-Gidley found that Wroblesky "seemed to have some struggles" in understanding, remembering, and carrying out instructions, particularly with his memory. Tr. 1638. She found that it "seem[ed] likely" Wroblesky would be able to understand and follow directions as long as they were simple, presented one at a time, and executed immediately. *Id*. Dr. Janco-Gidley found that it "seem[ed] likely" that Wroblesky would struggle if the directions were more complex or if there were a delay between Wroblesky's receiving instructions and his execution of them. *Id*. Dr. Janco-Gidley suggested Wroblesky would benefit from receiving written instructions to which he could refer. *Id*.

In September 2018, state agency consulting physician Gerald Klyop, M.D., found that despite several severe impairments, Wroblesky had the physical RFC to occasionally lift or carry 10 pounds, frequently lift or carry 10 pounds, stand or walk for about two hours, and sit for about six hours. Tr. 78–80. Dr. Klylop found that Wroblesky had the RFC to perform sedentary labor with additional limitations. Tr. 83–84. In May 2021, state agency consulting physician Kalpna Desai, M.D., reviewed the medical evidence during reconsideration and adopted Dr. Klyop's findings. Tr. 114–16, 120.

In November 2018, state agency consulting psychologist Paul Tangeman, Ph.D., found that Wroblesky was not limited in his ability to

socially interact but that he had limitations in understanding and memory, sustained concentration and persistence, and adaptation. Tr. 80–81. Dr. Tangeman opined that Wroblesky was capable of work in a consistent setting, so long as there were clear performance expectations, relatively static duties, and only occasional changes in routine. Tr. 82. Dr. Tangeman further opined that Wroblesky should be advised of any major changes in advance and that those changes should be implemented gradually. *Id*. In February 2021, state agency consulting psychologist Todd Finnerty, Psy.D., reviewed the evidence during reconsideration and adopted Dr. Tangeman's findings. Tr. 117–19.

### 4. Function Report

In August 2018, Wroblesky completed an Adult Function Report. Tr. 283–90. The report asked Wroblesky to explain how his impairments prevented him from working. Tr. 283. He cited his easy fatigue, low oxygen level, intolerance of heat, and poor memory. *Id*. He noted his reliance on his parents to remind him to take medication every day. *Id*. Wroblesky checked boxes indicating that his impairments affected his memory, completion of tasks, concentration, understanding, and ability to follow instructions. Tr. 288. He said that on a typical day, he worked, had dinner, went to church, and played video games. Tr. 284. Once a week at church, he played in the band. *Id*. He handled his own personal care. Tr. 284–85. Wroblesky said that he prepared simple meals—sandwiches, canned soup, frozen meals, and eggs—a few times each week. Tr. 285. He helped with laundry, dishes, and some

cleaning. *Id*. Wroblesky went outside every day for work and church and drove himself wherever he needed to go. Tr. 286. He handled a savings account, checkbook, and could count change. Tr. 286. Wroblesky shopped for his own clothes in a store. *Id*. He enjoyed playing computer games and was proficient at multiple musical instruments. Tr. 287.

### 5. Testimonial evidence

Wroblesky and a vocational expert testified before ALJ Leland in October 2019. Tr. 33–65. Attorney Michael Borowski represented Wroblesky. Tr. 33. Wroblesky discussed his home life. Tr. 49–53. He said that he lived in a house with his parents and younger brother. Tr. 49. His mother helped him remember to take his medications. Tr. 49. His younger and older brothers "mainly" completed household chores but Wroblesky could do the vacuuming and dusting. Tr. 53. He had his driver's license and drove frequently. Tr. 41.

Wroblesky said that he had a few friends with whom he watched movies, hung out, and talked at least once a month. Tr. 49–50. He met these friends at his church, where he was involved in the youth group and played guitar in the band. Tr. 50. Wroblesky practiced guitar for about an hour each day. Tr. 52. He learned to play songs by sight and could do so by watching a friend or watching videos online. Tr. 51. It took him about two days to learn a new song. Tr. 58. Sometimes, he had issues remembering the chords or what songs he was going to play in the church band. Tr. 58. He also played the drums and said that he could play one or two songs before he got out of breath. Tr. 58.

Wroblesky used his computer to go on the internet and scroll through Facebook. Tr. 52.

Wroblesky graduated from high school. Tr. 41. He testified that he had been a special education student and received special accommodations at school. Tr. 54–55. For example, during testing, he could use notes, he was allowed extra time, and a teacher's aide sat next to him to repeat or clarify test questions. Tr. 55.

Wroblesky testified that he worked between 15 and 20 hours per week at McDonald's and had worked there for nearly three years. *See* Tr. 42. His duties included making fries in the fryers. *Id*. At work, he estimated that he lifted "ten, maybe fifteen pounds." Tr. 46. He said that he never "work[ed] the front desk as a cashier" but "[s]ometimes … work[ed] the front register … and help[ed] hand out … drive thru [orders] because [his drive-thru colleagues were] usually backed up." Tr. 42, 46. McDonald's provided Wroblesky special accommodations. Tr. 56. For example, he was allowed to take more breaks per shift than the average employee and was able to sit down if he became short of breath. *Id*. Wroblesky also testified that in 2016, he had worked full-time overnight at Walmart for several months. Tr. 47–48, 55. Wroblesky's duties at Walmart included unloading trucks and stocking the retail floor with groceries. Tr. 48. Wroblesky said that his job required him to be on his feet for seven hours and to lift, on average, 25 pounds. *Id*. He was fired because he missed too many days of work. Tr. 55.

Wroblesky said that he couldn't work full-time because of his low oxygen saturation, which discolored his fingers and winded him easily. Tr. 48. At work, he had difficulty keeping pace with other employees. Tr. 48. He testified that he could sit for "four to five" hours and stand for "two to three" hours at a time. Tr. 49. He could comfortably lift no more than 10 pounds. Tr. 49. He could walk for a maximum of five minutes before becoming short of breath. Tr. 49. Cold and hot temperatures also implicated his low oxygen level and aggravated his shortness of breath. Tr. 54.

During the hearing in 2019 vocational expert Deborah Lee testified after Wroblesky. Tr. 61–65. According to Lee, a hypothetical individual with the same age, education, and work experience as Wroblesky, with the limitations assessed in Wroblesky's RFC, could not perform any of Wroblesky's past work. Tr. 61–62. Such an individual could, however, perform sedentary, unskilled labor such as a final assembler, sorter, and bonder for a semiconductor. *See* Tr. 62. Lee testified that being off task more than 20% of the workday or absent more than twice a month on a consistent basis would also preclude such an individual from all work. Tr. 64.

Wroblesky testified during the remand hearing in November 2022. Tr. 1765–91. Attorney Borowski also represented Wroblesky during this hearing. Tr. 1765. Wroblesky continued to live with his parents. Tr. 1772. He still relied on his mother to remind him to take his medications. Tr. 1777. Wroblesky did about ten percent of the indoor household chores such as cooking, washing

14

dishes, laundry, dusting, vacuuming, sweeping, and mopping. Tr. 1779. He could perform housework for about 20 minutes before he needed to rest. *Id*. Wroblesky had his driver's license and drove himself to work several times per week. Tr. 1773. Except for his parents, he no longer socialized with any friends or family. Tr. 1777. Wroblesky  no longer played guitar once a week. Tr. 1777. It had become "too much" for him and the church band also hadn't resumed performances after the COVID-19 pandemic. Tr. 1777–78. Wroblesky spent his free time playing video games online with friends he had met on Facebook. Tr. 1778–79. Wroblesky testified that sometimes when he and his friends were playing videogames online he needed his friends to remind him how to accomplish certain tasks. Tr. 1784.

Due to COVID-19 concerns, Wroblesky no longer worked at McDonald's. Tr. 1775. He instead worked at Harbor Freight from 4:00 a.m. until 8:00 a.m. for about 20 to 25 hours per week. Tr. 1773–74. His duties included stocking shelves and unloading inventory from trucks. Tr. 1774. Wroblesky initially testified that he became exhausted after a couple of minutes of lifting 40 to 50 pounds. *Id*. Wroblesky later clarified that "every once in a while" he wasn't able to tolerate continuous heavy lifting. Tr. 1775. As a result, when his job required him to lift heavy objects, he would sit down for a break every 30 minutes. Tr. 1775. Harbor Freight accommodated Wroblesky in this respect. Tr. 1775. He testified that he was allowed a seated break every 30 minutes and permitted three breaks more than an average employee. Tr. 1775, 1781. Nonetheless,

15

Wroblesky said that when he was working, he constantly felt like he needed to rest. Tr. 1781. He said that he would forget details such as, for example, which items he was supposed to place on certain shelves. Tr. 1781. Wroblesky explained that it had once taken him 40 minutes and three clarifying questions to correctly place items on display shelves. Tr. 1782. One time, Harbor Freight formally disciplined Wroblesky for not completing tasks on time. Tr. 1782–83. He was disciplined a total of two or three times over his two-year tenure at Harbor Freight. *Id.*

Wroblesky said that he could not work full-time because he became "super exhausted pretty quick and out of breath." Tr. 1776. Wroblesky testified that he could sit in an office-style chair comfortably for one hour or an hour and a half. Tr. 1776. He could comfortably stand for up to 20 minutes and walk for up to 15 or 20 minutes. *Id.* He could lift 50 pounds comfortably. Tr. 1777.

Vocational expert Allison Reno then testified. Tr. 1785–91. According to Reno, a hypothetical individual with the same age, education, and work experience as Wroblesky, with the limitations assessed in Wroblesky's RFC, described below, could not perform any of Wroblesky's past work. Tr. 1786. Such an individual could, however, perform sedentary, unskilled labor such as an order clerk, table worker, and final assembler. Tr. 1787. Reno testified that being off task more than 15% of the workday or absent more than once a month consistently would be work preclusive. Tr. 1789.

16

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2.  The claimant engaged in substantial gainful activity during the following periods: October - December 2018 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.  The claimant has the following severe impairments: hypoplastic left heart syndrome, post Norwood, bidirectional Glenn, Fontan, and LPA stenting with remote history of strokes and seizures; chronic hepatic congestion; depression; anxiety; learning disability; and attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c) and 416.920(c)).

5.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (20 CFR 404.1520(c) and 416.920(c)).

    – The claimant has a moderate restriction in understanding, remembering, or applying information.

    – The claimant has mild difficulties in interacting with others.

    – The claimant has moderate difficulties in concentrating, persisting, or maintaining pace.

&mdash; The claimant has moderate difficulties in adapting or managing oneself.

6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: He can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. He can frequently be exposed to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, and extreme heat. He has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production rate pace (i.e., assembly line work). He is limited to simple work-related decisions in using his judgment. He is limited to dealing with occasional changes in a routine work setting.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. The claimant was born [in August 1996] and was 0 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20

CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 1996, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 1744–58.

**Standard for disability**

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

**Discussion**

*Whether substantial evidence supports the ALJ's assessment of Dr. Janco-Gidley's medical opinions.*

In his decision, the ALJ found partially persuasive the sum total of the medical opinions provided by consultative psychological examiner Julie Janco-Gidley, Ph. D. Tr. 1754–55. After detailing Dr. Janco-Gidley's findings, Tr. 1754, the ALJ assessed the persuasiveness of each opinion individually, Tr. 1755. While he incorporated the majority of Dr. Janco-Gidley's opinions into the RFC, the ALJ declined to adopt Dr. Janco-Gidley's limitation that Wroblesky was likely able to understand and follow simple directions if they were "presented one at a time" and if he was able to immediately execute them. Tr. 1755. The ALJ found unpersuasive Dr. Janco-Gidley's opinion that Wroblesky was "likely to struggle" with more complex directions or if there was

21

a delay between the instruction and its execution. *Id*. Wroblesky claims that the ALJ didn't properly analyze these findings and failed to provide an adequate basis, rooted in the factors of supportability and consistency, for excluding the disabling portion of Dr. Janco-Gidley's opinion. Doc. 8, at 10–12. Wroblesky's argument fails for a few reasons.

Under the applicable standard, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). *Supportability* and *consistency* are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2).

Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2).

"[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022

WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ found Dr. Janco-Gidley's opinions persuasive to the extent that they limited Wroblesky to simple, routine, and repetitive tasks that were not performed at a production-rate pace. Tr. 1755. The ALJ accounted for Dr. Janco-Gidley's opinions in the RFC except for the opined limitation that Wroblesky's ability to understand and carryout complex tasks were restricted as Dr. Janco-Gidley described. Tr. 1755. The ALJ questioned Dr. Janco-Gidley's reliance on Wroblesky's self-reported limitations during a one-time interaction as the sole basis for her opinion. *Id*. And although the ALJ did not refer to the factors of supportability and consistency explicitly, he was not required to do so because he considered their merits.[8] *See Cormany*, 2022 WL 4115232, at *3.

---

[8]     Wroblesky seems to argue that *Andrew M. v. Comm'r of Soc. Sec.*, No. 1:20-CV-906, 2022 WL 683457, at *3 (S.D. Ohio Mar. 8, 2022) requires an ALJ to *explicitly* direct the reader to his explanation of the "supportability" and "consistency" factors and that the ALJ's failure to cite those terms by name here represents error. Doc. 8, at 13–14.  An ALJ, however, must only *explicitly discuss* the factors of supportability and consistency and need not "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany*, 2022 WL 4115232, at *3.

The ALJ, albeit without explicitly saying so, discussed the supportability of Dr. Janco-Gidley's limitation on Wroblesky's ability to understand, remember, and carry out instructions by reviewing Dr. Janco-Gidley's own examination findings. *See* Tr. 1754. And, as the Commissioner points out, there is little support in these findings for the opined limitations. Tr. 1632–39. For example, Dr. Janco-Gidley found Wroblesky well-oriented as to person, place, and time. Tr. 1754. His cognitive function was in the low average range. *Id*. His insight and judgment were fair. *Id*. Wroblesky expressed himself in a clear and appropriate manner. *Id*. He exhibited a logical, linear, and coherent thought process. *Id*. Wroblesky was capable of reciting three objects immediately after they were presented and two objects after five minutes. *Id*. The ALJ cited to all of these findings before assessing the persuasiveness of Dr. Janco-Gidley's opinions.

The ALJ also considered the likelihood that Dr. Janco-Gidley's opinions were based solely on Wroblesky's subjective statements made to her during her one-time interaction with Wroblesky in November 2018. *See* Tr. 1755. There is no indication that Dr. Janco-Gidley relied on anything other than Wroblesky's subjective claims when she determined his limitations in understanding, remembering, and carrying out instructions. Tr. 1638. Dr. Janco-Gidley, in fact, cited Wroblesky exclusively when she addressed that area of mental function in her report, writing that:

> Mr. Wroblesky reports he feels he is ok with
> understanding instructions, but remembering is a

> bit of a struggle for him. He reports he can follow instructions "pretty good," if he can remember them, but would struggle with complex instructions. According to the Adult function Report, his mother helps him understand how to follow instructions and with written instructions he reportedly forgets what he is doing at times and his mother or boss help to keep him on track, but he feels he does okay following spoken instructions.

Tr. 1638 (recorded as written). There was thus a basis for the ALJ to discount the supportability of Dr. Janco-Gidley's medical opinion in the area of understanding, remembering, and carrying out complex instructions, and to find unpersuasive the disabling portion of that opinion. *See, e.g.*, *Owens v. Comm'r of Soc. Sec.*, No. 3:20-cv-1737, 2021 WL 8342841, at *6 (N.D. Ohio Sept. 15, 2021) (rejecting the plaintiff's argument that the ALJ failed to discuss the supportability factor because the ALJ, while not using the word *supported*, stated that the doctor's opinion relied heavily on the claimant's subjective reports of symptoms, which is relevant to the supportability factor), *adopted* 2023 WL 6283030 (N.D. Ohio Sept. 27, 2023).

The ALJ also considered Dr. Janco-Gidley's relationship with Wroblesky when considering the supportability of her opinions. This included analysis of the length of the relationship, the frequency of examinations, and the purpose of the relationship. *See* 20 C.F.R. §§ 404.1520c(c)(3)(i–v), 416.920c(c)(3)(i–v) (listing a medical source's "relationship to a claimant" as a factor to be considered when determining the weight to give the source's opinion); *see also Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 816–17 (6th Cir. 2020)

(affirming an ALJ's finding that the diagnoses of a consultative examiner were not persuasive due, in part, to the fact that they were "based on a one-time examination" of the claimant). Here, the Ohio Division of Disability Determination referred Wroblesky to Dr. Janco-Gidley for an evaluation with the sole purpose of determining benefit eligibility. Tr. 1632. Dr. Janco-Gidley met Wroblesky and his mother once. Tr. 1632–39. Dr. Janco-Gidley's report thus relied heavily on Wroblesky's and his mother's reporting of Wroblesky's history and background. *See, e.g.*, Tr. 1634 (Wroblesky's mother reporting his diagnosis and progress with Attention Deficit Hyperactivity Disorder), 1636 (Wroblesky reporting his work history, affect and mood, and anxiety symptoms and his mother reporting Wroblesky's behavior health history at school), 1637 (Wroblesky reporting his abilities to perform activities of daily living and his mother reporting his childhood medical history of surgeries and seizures), 1638 (Wroblesky reporting his mental health issues and his ability to understand, remember, and carry out instructions), 1639 (Wroblesky reporting his abilities in (1) maintaining attention, concentration, and persistence, (2) responding to supervision and others in the work setting, and (3) responding to pressure in the work setting). In her report, Dr. Janco-Gidley stated that "the above-mentioned claimant was examined for a consultative examination. No doctor-patient relationship exists or is implied by this examination." Tr. 1639.

As to consistency, Wroblesky claims that the ALJ "[did] nothing to compare her opinion to the remainder of the medical evidence and opinions in

the record" and "only cited" that Wroblesky was "able to play the guitar" before opining that doing so amounted to performing a complex task. Doc. 8, at 13 (citing Tr. 1755). Wroblesky says that the ALJ only cited Wroblesky's playing guitar for at most one hour per day and "repeatedly playing songs" with which he was already familiar. *Id*. Wroblesky argues that none of this showed that Dr. Janco-Gidley's disabling limitation was incorrect. *Id*.

It is true that the limited statements Wroblesky mentions do not necessarily demonstrate an inconsistency between Dr. Janco-Gidley's limitation and the rest of her findings or the record. But these are not the only statements Wroblesky made, and they were not the only statements cited by the ALJ to support his finding unpersuasive the contested portion of Dr. Janco-Gidley's opinion. Tr. 1755; *see also* Tr. 39–59, 283–90, 1772–85. In addition to considering "that Wroblesky was able to play guitar," Doc. 8, at 13, the ALJ considered Wroblesky's proficiency at multiple musical instruments. Tr. 1755. It wasn't merely Wroblesky's ability to "repeatedly play[] [familiar] songs that implicated Wroblesky's ability to understand, remember, and carryout complex instructions*, see* Doc. 8, at 13, but his ability to learn a new song in two days, Tr. 1755 (citing Tr. 58). The ALJ noted that Wroblesky's playing of multiple musical instruments involved the performance of more complex tasks than Dr. Janco-Gidley's limitation would find Wroblesky capable of consistently performing. *Id*. Through these statements, the ALJ showed that Wroblesky had at least made contradictory claims as to his capacity to

27

understand, remember, and carry out complex and simple instructions and tasks. *See* Tr. 1755. These statements undercut the supportability and consistency of Dr. Janco-Gidley's opined limitations.

The ALJ also considered consistency when he considered "other factors that tend[ed] to support or contradict a medical opinion or prior administrative medical finding" and cited Wroblesky's ability to play musical instruments. *See* 20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5).

When the ALJ's decision and the record evidence are considered as a whole, it is evident that Dr. Janco-Gidley's opinions of Wroblesky's abilities and limitations with understanding and following simple and complex instructions are inconsistent with the rest of the record evidence. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the Secretary's findings must be based on the record as a whole."); *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense."). The ALJ could have more clearly packaged his findings. The decision as a whole, however, contains enough information to understand why the ALJ did not adopt Dr. Janco-Gidley's contested limitations. *See* Tr. 1754 (citing Tr. 407–14, 1632–40).

For starters, the majority of the record evidence pertains to Wroblesky's cardiovascular issues and it's clear that he has received minimal mental health treatment. *See, e.g.*, Tr. 415–1630, 1642–51, 1651–1737, 1745, 1748–53, 1755–

28

56. In addition to Dr. Janco-Gidley's findings, Dr. Galioto's neuropsychological examination findings are the only other objective records that specifically address Wroblesky's mental abilities and limitations. *See* Tr. 407–14, 1632–40.

Dr. Galioto found Wroblesky alert and oriented with a pleasant affect. Tr. 411. He was adequately groomed, made direct eye contact, and had a pleasant manner of relating. *Id*. Wroblesky had a low average full-scale IQ and high average processing speed. *Id*. Specific to attention and memory, Wroblesky's processing speed was average to superior. *Id*. His basic attention was only moderately impaired. *Id*. His auditory working memory was average. *Id*. Wroblesky had a mildly impaired complex working memory. *Id*. While his learning and memory were "impaired overall," Wroblesky's performance improved "with cueing," visual information testing, and tests of recognition. Tr. 412. Dr. Galioto's findings—particularly Wroblesky's average to superior processing speed, no more than moderately impaired attention, average auditory working memory, and improved performance with visual information and cues—are inconsistent with Dr. Janco-Gidley's limitation that Wroblesky could likely only understand and follow simple directions "presented one at time" that he was able to execute "immediately." *See* Tr. 411–12, 1638. Dr. Galioto's findings are also inconsistent with Dr. Janco-Gidley's limitation that Wroblesky would "likely … struggle" with more complex directions or if there was a delay between when Wroblesky received the directions and when he needed to execute them. *See* Tr. 411–12, 1638. Dr. Galioto's findings instead

support the ALJ's RFC determination that Wroblesky was capable of simple, routine, and repetitive tasks as long as he wasn't required to do so at a production-rate pace. *See* Tr. 20, 411–12.

The opinions of the state agency consulting psychologists—which the ALJ found persuasive—provide further support for the ALJ's RFC and are also inconsistent with the contested portion of Dr. Janco-Gidley's opinion. *See* Tr. 80–82, 117–19, 1747–48. As the Commissioner notes, the state agency doctors had the benefit of Dr. Galioto's and Dr. Janco-Gidley's completed reports when they developed their opinions, *see* Tr. 82, 119, 414, 1640, yet neither found Wroblesky limited to the extent that Dr. Janco-Gidley found him limited, *see* Tr. 80–82, 117–19; Doc. 8, at 10, 12.

Wroblesky makes a cherry-picking argument and claims that although evidence existed to support a more restrictive RFC determination, the ALJ "selectively picked his way through the medical evidence." Doc. 8, at 15. Wroblesky claims that the ALJ ignored evidence such as the results from formal cognitive testing, scholastic reports from Wroblesky's childhood, and the items-on-the-shelf example from Wroblesky's testimony. Doc. 8, at 15–16. The Sixth Circuit, however, has observed that what one might argue is "cherry-picking," might "be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). That Court has further noted that cherry-picking arguments are "seldom successful" because "crediting [them] would require a court to re-weigh record evidence." *DeLong*

*v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (internal citation omitted). Here, the ALJ did not "cherry pick" the record. The ALJ credited many of Wroblesky's alleged impairments, *see* Tr. 18, and incorporated most of the medical opinions, including the opinions offered by Dr. Janco-Gidley, into the RFC, *see* Tr. 20. He cited many sources—treatment records, test results, testimonial evidence, school records, records from an emergency hospital visit, records from Wroblesky's primary care physician, and the reports of Dr. Janco-Gidley, Dr. Galioto, and the state agency consultative physicians and psychologists—in a thorough, 14-page decision. *See* Tr. 15–28. If cherry-picking occurred, it was Wroblesky who "selectively picked" evidence in support of his position at the expense of full context and the decision as a whole. *See, e.g.*, Doc. 8, at 13.

Wroblesky may be able to, as he claims, point to evidence that supports the adoption of Dr. Janco-Gidley's more restrictive limitations. He fails, however, to establish that the ALJ's less restrictive RFC is *not* supported by substantial evidence. And this is important, because "[s]o long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). So whether substantial evidence exists to support Dr. Janco-Gidley's simple-and-complex-instruction opinions is irrelevant because substantial evidence also supports the view of those opinions that the ALJ adopted. Tr. 1754–55. And so long as the ALJ explains

his decision adequately, he is not obligated to fully adopt the opinion of a medical source. *See Wright v. Colvin*, No. 1:15-cv-01931, 2016 WL 5661595, at *10 (N.D. Ohio Sept. 30, 2016); *Jefferson v. Colvin*, No. 1:14-cv-01851, 2015 WL 4459928 at *6 (N.D. Ohio July 21, 2015). Wroblesky fails to demonstrate any specific flaw in the ALJ's logic or otherwise show that the ALJ's conclusions were based on less than substantial evidence. Wroblesky may not agree with the ALJ, but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15cv01269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016).

**Conclusion**

For the reasons explained above, I affirm the Commissioner's decision.

Dated: October 30, 2023

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge